UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 1:21-cr-592 (ABJ) |
| v.   : | |
| : | |
| DAVID WIERSMA, : | |
| : | |
| **Defendant** : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant David Wiersma to 45 days' incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

I.  **Introduction**

Defendant David Wiersma ("Wiersma"), a 68-year-old quality control engineer from Illinois, and his codefendant, Dawn Frankowski,[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[2]

---

[1] Frankowski is scheduled to be sentenced by this Court on November 30, 2022.
[2] Although the Statement of Offense in this matter, filed on August 30, 2022, (ECF No. 53 ¶ 6) reflects a sum of more than $2.7 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

Defendant Wiersma pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because Wiersma (1) entered the Capitol, despite walking past smashed glass near the Senate Wings Doors and hearing a blaring security alarm; (2) proceeded into the private hideaway office of Senator Jeff Merkley of Oregon and the Senate Spouse's Lounge, two sensitive spaces within the Building; (3) used social media to continue to spread false information after January 6; and (4) later made statements to minimize his own responsibility, telling a local news channel that the crowd at the Capitol was peaceful.

The Court must also consider that Wiersma's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Wiersma's crime support a sentence of 45 days' incarceration.

**II.    Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 53 (Statement of Offense), at 1-7.

*Defendant Wiersma's Role in the January 6, 2021 Attack on the Capitol*

Wiersma traveled on January 5, 2021, to Washington, D.C. from Northern Illinois with codefendant Dawn Frankowski (Frankowski) and a third person to attend the rally for former President Donald Trump.  ECF 53 ¶ 8.

The next morning, on January 6, 2021, the three attended the rally. While at the rally, Wiersma made a recording of himself as former President Trump spoke in the background.  Exhibit

1 (Figure 1, below). Looking into the camera as it recorded, Wiersma stated "Our country is being stolen from us-what are we going to do?"



*Figure 1*

Following the rally, Wiersma answered his own call to action by going with the crowd to the U.S. Capitol.  ECF 53 ¶ 9.  Wiersma entered the U.S. Capitol, at approximately 3:02 p.m. through the Senate Wing doors.  ECF 53 ¶ 10 (Figure 2, below).  At the time that Wiersma entered the Capitol, rioters had shattered windows, as depicted below with a yellow box, and knocked over furniture, as indicated below with a red arrow. Moreover, at the time that Wiersma entered the Capitol, another January 6 defendant named Anthime Gionet (circled in yellow below) was live-streaming through the gaming website DLive under the handle, "BakedAlaska."

3



*Figure 2*

Wiersma is not visible in this segment of Anthime Gionet's footage; however, the livestream footage captures the blare of the security alarm and the chanting that Wiersma would have heard as he entered the building. Exhibit 2. Rather than turning around and leaving after seeing the disorder inside the building, Wiersma continued deeper into the U.S. Capitol and proceeded into private hideaway office of Senator Jeff Merkley of Oregon. ECF 53 ¶ 11. Gionet entered the Senator's office around the same time as Wiersma (circled in red) and Frankowski (circled in blue), and the footage from his livestream captured the chaos inside the room as another rioter sat back with his feet propped up on the Senator's conference table and other rioters appeared to rummage through items in the office. Exhibit 3 (Figure 3, below).[3]

---

[3] Later that night, Senator Merkley returned to the office Wiersma had been in and found that it had been ransacked. The senator recorded the damage he found and shared it via social media. The video can be viewed here: https://www.facebook.com/ABCNews/videos/sen-jeff-merkley-shows-damage-done-to-officeafter-pro-trump-mob-vandalized-capi/222464836136603.



*Figure 3*

Rather than deciding to leave, Wiersma went further into the Capitol and went into the Senate Spouses Lounge. Once again, Gionet followed a similar path such that Wiersma is once again captured on video. Exhibit 4 (Figure 4, below). Wiersma can be seen looking out the window at the large crowd of police officers gathered outside on the West Front.



*Figure 4*

Wiersma and Frankowski then walked down the hallway to the Crypt, before turning around and exiting out the Senate Wing doors around 3:13 p.m. ECF 53 ¶ 12. They were inside the Capitol Building for approximately 11 minutes.

5

Later that day, Wiersma posted on Facebook the following message: "we joined the protest inside. From what we know and experienced two people were shot one fatally.  Many were tear gassed.  We only experience[d] a little of that.  Spent 30 minutes inside and got out before the swat team went in."  The "we" in this post refers to Wiersma and Frankowski.  ECF 53 ¶ 13.

Wiersma also sent an instant message to a friend after he left the Capitol which showed little remorse for the events of the day and predicted that things would only get worse:

> Everyone is a passive until they get pinched [sic] in the nose. The fact the DOJ and FBI refused to look at evidence before they refuted it lite the fuse. People have had enough. It is going to get worse.

*Statements Made After January 6*

After the attack on the Capitol, Wiersma used Facebook to spread false information in an attempt to minimize his actions comparing the atmosphere inside the Capitol to the equivalent of "going to the shopping mall." (Figure 5 below).  He also claimed that the events of the day had been staged by ANTIFA, BLM, and Capitol police.



*Figure 5*

Wiersma also shared a message that was circulating on Facebook at the time which stated in part that:

> The implementation of the Insurrection Act began after the raid on the Capitol and was marked by Trumps broadcast to the people to disband and return home. This broadcast wound up being blocked, for the most part, by the media. Nevertheless, his address fulfilled the requirements to initiate the Act…

6

> His press release of a 'smooth transition' did not include the word, 'concede' as he has no plans to do so. Rather, there will be a smooth transition of power to his new cabinet, staff and Vice President, General Flynn.

In response to this message, Wiersma's co-defendant, Frankowski replied: "If trump doesn't get this done we are going to jail."

After returning to Illinois, Wiersma also sat for a televised interview that aired on January 8, 2021 on ABC 7 Chicago. In the interview, Wiersma sought to minimize what had taken place at the Capitol, stating that "there didn't seem to be any animosity" but rather that people were "shouting slogans about stop the steal and whatnot." Exhibit 5 (Figure 6, below).



*Figure 6*

As the national focus on the events of January 6 intensified, Wiersma and Frankowski sought to erase evidence of their involvement with the attack on the Capitol. On January 12, 2021, Wiersma and Frankowski exchanged the following messages with the apparent aim of deleting evidence and establishing the false story that they had not entered the building:

<u>Frankowski</u>: Erase my pic

<u>Wiersma</u>: What pic?

<u>Frankowski</u>: On phone. You took pic of me inside with statute.

<u>Wiersma</u>: You are mistaken. Tried to and it was dead…Besides, that was outside. We were never inside the Capitol if you remember correctly. I bragged that we were to people because I thought it was funny.

Wiersma knew at the time he entered the Capitol that he did not have permission to enter the building and he knowingly paraded, demonstrated, or picketed inside the building.

*The Charges and Plea Agreement*

On September 13, 2021, the United States charged Wiersma by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2); and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G). On September 21, 2021, law enforcement officers arrested him at his home in Illinois. On September 22, 2021, the United States charged Wiersma by information with violations of 18 U.S.C. §§ 1752(a)(1), (a)(2); and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G). On August 30, 2022, pursuant to a plea agreement, Wiersma pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104 (e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Department of the Treasury.

**III.   Statutory Penalties**

Wiersma now faces a sentencing on a single count of violating 40 U.S.C. § 5104 (e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the

8

nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 45 days' incarceration.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy. *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Wiersma's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Wiersma, the absence of violent or destructive acts is not a mitigating factor. Had Wiersma engaged in such conduct, he would have faced additional criminal charges.

Here, Wiersma entered the Capitol through the Senate Wing Doors, despite detecting tear gas fired by police attempting to repel the rioters, passing smashed glass near the Senate Wing Doors, and hearing a blaring security alarm. Once inside the Capitol, he spent time inside Senator Merkley's hideaway office and the Senate Spouse's Lounge, both sensitive spaces within the Capitol.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Wiersma

As set forth in the PSR, Wiersma's criminal history consists of a 2004 arrest for the attempted possession of a controlled substance and a 2013 traffic infraction. ECF 59 at 7. Wiersma has been compliant with his conditions of pre-trial release. The government also notes that Wiersma accepted an opportunity to plead guilty and acknowledge his criminal conduct and promptly resolve his case.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

10

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Defendant Wiersma's actions – before, during and after the riot – demonstrates the need for specific deterrence. As stated above, on the morning of January 6, while at the Stop the Steal rally, Wiersma made a recording of himself in which he stated that the alleged voter fraud during the 2020 election was "treason" and he claimed that "our country is being stolen from us." After illegally entering the Capitol—and seeing the chaotic scene

11

inside two private offices—Wiersma sent a private message to a friend in which he defended the actions of the crowd and predicted that things were "going to get worse." This lack of remorse and prediction of future violence demands a sentence of incarceration to impress upon Wiersma the true seriousness of his conduct, and to show the public that no rioter was an invited tourist on January 6.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Wiersma based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Wiersma has pleaded guilty to Count Four charging him with parading, demonstrating, or picketing, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

---

[4] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section

3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense

is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2. That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building. As noted above, while Senator Merkley's office was not labeled as such, it was clearly recognizable as a private office, and thus implicates similar concerns.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Scavo*, 21-cr-254 (RCL), the defendant spent about 10 minutes inside the Capitol and observed that law enforcement had deployed teargas in an effort to repel rioters. Defendant also sat for a television interview following the events of January 6 in which he downplayed his conduct at the Capitol. The defendant pled guilty to violating 18 U.S.C. § 5104(e)(2)(G) and Judge Lamberth sentenced him to 60 days' incarceration.

In *United States v. Sarko*, 21-cr-591 (CKK), the defendant entered Senator Merkley's hideaway office and the Senate spouse's lounge without authorization. Defendant also ignored multiple warning signs such as teargas and broken windows indicating it was unlawful to enter Capitol building. The defendant pled guilty to violating 18 U.S.C. § 5104(e)(2)(G) and Judge Kollar-Kottelly sentenced him to 30 days' incarceration.

In *United States v. Mazzocco*, 21-cr-54 (TSC), the defendant remained inside the Capitol for a brief period of time – approximately 12 minutes – yet made his way into both the Crypt and the Senate Spouse's Lounge, and sent messages to family and friends after the events of January

16

6 in which defendant endorsed the disruption of the Congressional proceedings. He pled guilty to violating 18 U.S.C. § 5104(e)(2)(G) and Judge Chutkan sentenced him to 45 days of incarceration.

The government acknowledges that Felipe Marquez, who also entered Senator Merkley's office, received a sentence of three months' home detention; the government had recommended four months' incarceration. *United States v. Marquez,* 21-cr-136 (RC). Judge Contreras, however, explained that Marquez's documented mental-health issues had a "significant influence" on his sentence, and believed that probation would best allow Marquez to receive mental-health treatment. *Marquez,* Tr. 12/10/21 at 32, 34, 37. One other defendant who entered Senator Merkley's office also received a probationary sentence, but unlike Wiersma, he did not also go into the Senate Spouses lounge nor did he have any social media postings. *See United States v. Edwards,* 21-cr-366 (JEB).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

IV. **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 45 days' incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/ *Jason M Crawford*
Jason M. Crawford
Trial Attorney, Detailee
DC Bar No. 1015493
175 N St. NE
Washington, D.C. 20002
(202) 598-1099
Jason.M.Crawford@usdoj.gov

## CERTIFICATE OF SERVICE

On this 17 day of November, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

                                                  /s/ *Jason M. Crawford*
                                                 Jason M. Crawford
                                                 Trial Attorney